**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **NEW HAMPSHIRE INSURANCE COMPANY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION 07-0754-WS-M** |
| | ) | |
| **BLUE WATER OFF SHORE, LLC,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## ORDER

This matter is before the Court on the motion of plaintiff New Hampshire Insurance Company ("New Hampshire") for summary judgment and on the motion of defendant Blue Water Off Shore, LLC ("Blue Water") for partial summary judgment. (Docs. 107, 110). Also pending are several motions to strike various portions of the evidentiary materials. (Docs. 128, 138, 140).[1] The parties have filed briefs and evidentiary materials in support of their respective positions, (Docs. 108-09, 111-17, 119, 122, 124-28, 133, 136-45), and the motions are ripe for resolution. After carefully considering the foregoing and other relevant material in the file, the Court concludes that both motions for summary judgment are due to be denied.

## BACKGROUND

Blue Water owned the TAR BABY, a 61-foot yacht ("the Vessel"). Blue Water obtained a policy of insurance on the vessel ("the Policy"), with New Hampshire as the insurer. The Policy contained an exclusion for losses arising from any intentional misuse or misconduct, or lack of reasonable care or due diligence, in the operation of the Vessel.

---

[1]Blue Water's motion to strike New Hampshire's motion to strike, (Doc. 142), is **denied**.

It contained another exclusion for losses arising from the criminal act of the insured's employee.

On the night of August 1, 2007, the Vessel approached Perdido Pass from the east after sailing from Panama City, with Captain James Cooper at the helm and mate Ronald Rice also on board. The Vessel allided with a submerged wall, rendering the Vessel a total loss. Officer Jody Kelley of the Alabama Marine Police arrested Cooper for boating under the influence in violation of Alabama law.

New Hampshire filed this declaratory action in October 2007, seeking a declaration that coverage is excluded because Cooper was operating the Vessel under the influence of alcohol at the time of the allision. (Doc. 1 at 5-8). Blue Water counterclaimed for breach of contract and bad faith, seeking policy limits of $1.75 million, additional compensatory damages exceeding $250,000, and punitive damages of approximately $3 million. (Doc. 13 at 9-10).

## DISCUSSION

The Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2).

Summary judgment should be granted only if "there is no issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir. 1991).

"When the *moving* party has the burden of proof at trial, that party must show *affirmatively* the absence of a genuine issue of material fact: it must support its motion with credible evidence ... that would entitle it to a directed verdict if not controverted at trial. [citation omitted] In other words, the moving party must show that, on all the

essential elements of its case on which it bears the burden of proof, no reasonable jury could find for the nonmoving party." *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1438 (11th Cir. 1991) (en banc) (emphasis in original); *accord Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).

"If the party moving for summary judgment fails to discharge the initial burden, then the motion must be denied and the court need not consider what, if any, showing the non-movant has made. [citation omitted] If, however, the movant carries the initial summary judgment burden ..., the responsibility then devolves upon the non-movant to show the existence of a genuine issue of material fact." *Fitzpatrick*, 2 F.3d at 1116. "For issues on which the movant would bear the burden of proof at trial, the non-movant, in order to avoid summary judgment, must come forward with evidence sufficient to call into question the inference created by the movant's evidence on the particular material fact." *Id*. "If the nonmoving party fails to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof, the moving party is entitled to summary judgment." *Clark*, 929 F.2d at 608 (internal quotes omitted).

The parties have submitted a large number of exhibits, some of which they have not cited or have cited only generally. There is no burden on the Court to identify unreferenced evidence supporting a party's position.[2] Similarly, "[t]here is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment." *Resolution Trust Corp. v. Dunmar Corp*., 43 F.3d 587, 599 (11th Cir. 1995). Accordingly, the Court's review is limited to those exhibits to which the parties have specifically cited. The Court's review is similarly

---

[2]*E.g., Adler v. Wal-Mart Stores, Inc*., 144 F.3d 664, 672 (10th Cir. 1998) ("The district court has discretion to go beyond the referenced portions of these [summary judgment] materials, but is not required to do so."); *accord Jones v. Sheehan, Young & Culp, P.C.*, 82 F.3d 1334, 1338 (5th Cir. 1996); *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989); *Lawson v. Sheriff of Tippecanoe County*, 725 F.2d 1136, 1139 (7th Cir. 1984); *Karlozian v. Clovis Unified School District*, 2001 WL 488880 at *1 (9th Cir. 2001); *see also* Local Rule 7.2.

limited to those legal arguments they have expressly advanced.

## I. Contract.

The parties agree (or assume for present purposes) that the existence of coverage depends on whether Cooper was legally intoxicated at the time of the allision. In cross-motions for summary judgment, each maintains that there is no genuine issue of material fact as to Cooper's intoxication and that it is entitled to judgment as a matter of law. Blue Water makes additional arguments concerning the delivery of the Policy and the identity of the Policy.

### A. Intoxication.

New Hampshire identifies the following as evidence of Cooper's intoxication at the time of the allision: (1) Officer Kelley detected an odor of alcohol on Cooper after the allision, his eyes were bloodshot and his speech slurred; (2) Cooper admitted to Officer Kelley that he had a "couple of" drinks with dinner; (3) Cooper failed two of four field sobriety tests and had difficulty on a third; (4) Cooper registered a blood alcohol content of 0.167 on a portable breath test; (5) Cooper later registered a blood alcohol content of 0.14 on a Draeger breathalyzer test; (6) Officer Kelley arrested Cooper for boating under the influence; (7) at his deposition, Cooper invoked the Fifth Amendment rather than answer questions; and (8) Cooper pleaded guilty to boating under the influence. Blue Water seeks to exclude most of this evidence and argues that it does not create a genuine issue of material fact concerning Cooper's intoxication.

#### 1. Motion to strike.
#### a. Cooper's admission.

When Officer Kelley got Cooper on his vessel, he smelled alcohol and so asked Cooper "how much he had had to drink." Cooper replied that he had consumed two

drinks with supper.  (Kelley Deposition at 32, 75, 117-18).[3]  Blue Water contends the statement is inadmissible hearsay, (Doc. 128 at 4), to which New Hampshire offers several responses.  (Doc. 133 at 8-9).

First, New Hampshire notes that a statement is not hearsay if it is offered against a party and is "a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship."  Fed. R. Evid. 801(d)(2)(D).  Blue Water admits that Cooper was its agent or servant and that his statement was made during the existence of that relationship.  Blue Water argues only that "eating supper over three hours before the incident was not within the scope of Cooper's agency."  (Doc. 137 at 6-7).[4]  Piloting his employer's vessel, however, and doing so safely, were squarely within the scope of Cooper's agency, such that his statement that he drank alcoholic beverages shortly before setting sail concerned matters within the scope of his agency.

Second, the statement of a witness who is unavailable to testify is admissible if "at the time of its making [it] so far tended to subject the declarant to civil or criminal liability ... that a reasonable person in the declarant's position would not have made the statement unless believing it to be true."  Fed. R. Evid. 804(b)(3).  Blue Water's only resistance to this proposition is that having a couple of drinks three hours before a boating accident does not "satisf[y] the requirements for boating under the influence."  (Doc. 137 at 7-8).  There is, however, no requirement that the statement must of itself establish criminal culpability.  On the contrary, the facially neutral statement, "Sam and I went to Joe's house" can trigger the exception.  *Williamson v. United States*, 512 U.S. 594, 603 (1994).  "The question under Rule 804(b)(3) is always whether the statement was

---

[3]Blue Water suggests the beverage was beer, but Kelley expressly testified that Cooper admitted to "a couple of drinks," not "a couple of beers."  (*Id*. at 118).

[4]New Hampshire concedes that Cooper ate supper "before leaving Panama City." (Doc. 124 at 13).

sufficiently against the declarant's penal interest," and that question "can only be answered in light of all the surrounding circumstances." *Id.* at 604.

The surrounding circumstances here include the following: (1) Cooper operated the Vessel shortly after dinner; (2) Florida, like Alabama, criminalizes boating under the influence, *see* Fla. Stat. § 327.35; (3) Cooper smelled strongly of alcohol after the accident, *see infra* Part I.A.1.b; and (4) Cooper's answer to Officer Kelley's question not only confirmed that he had been drinking before the allision but negated his drinking after the allision. Under these circumstances, Cooper's response very nearly admits the Florida crime of boating under the influence. More importantly, it eliminates his ability to contend that the alcohol Officer Kelley smelled was from post-allision drinking, which supports the conclusion that Cooper was intoxicated at the time of the allision and thus guilty of boating under the influence in violation of Alabama law. Under these circumstances, Cooper's statement to Officer Kelley so far tended to incriminate him that a reasonable person would not have made the statement unless he believed it was true.

In summary, Cooper's statement to Officer Kelley is admissible and can be considered on motion for summary judgment.

### b.  Cooper's appearance.

Once Cooper boarded Officer Kelley's vessel, the officer could smell alcohol from three to four feet away. Officer Kelley also observed that Cooper had bloodshot eyes and slurred speech. (Kelley Deposition at 32, 35-36). Blue Water argues that this evidence is "too remote and speculative" because Officer Kelley first observed Cooper some 40 minutes after the allision and some 30 minutes after Cooper, according to Rice, entered the cabin where the Vessel's alcohol was kept. (Doc. 128 at 2). Blue Water argues that several Alabama criminal cases require the exclusion of the evidence under such circumstances.

As a threshold matter, Blue Water does not explain the relevance of state, criminal

decisions to the admissibility of evidence in a federal, civil case.  The Court's jurisdiction is founded exclusively upon diversity of citizenship, and "in diversity cases, the Federal Rules of Evidence govern the admissibility of evidence in the federal courts."  *Flurry v. Daimler Chrysler Corp*., 427 F.3d 939, 944 (11th Cir. 2007) (internal quotes omitted).  Blue Water has not attempted to show the inadmissibility of the evidence under federal law, and the Court will not endeavor to supply the deficiency.

At any rate, Blue Water's position depends upon several facts being established which are not.  First, Blue Water considers it "undisputed" that Cooper was not intoxicated at the time of the allision, a proposition that relies exclusively on Rice's testimony to that effect.  (Doc. 128 at 2-4).  Blue Water has not explained why the jury would be required to credit Rice's testimony, and it plainly would not be so bound.  Rice is hardly a disinterested witness since, if Cooper was intoxicated, Rice knew it and yet allowed him to operate the Vessel.  Worse, there is evidence that Rice himself was intoxicated when Officer Kelley arrived, (Kelley Deposition at 37-38), and he admitted operating the Vessel shortly before the allision.  (Rice Deposition at 19).  Finally, as discussed above and below, there is evidence from Cooper himself that he drank before the allision, including his admission to Officer Kelley, his invocation of the Fifth Amendment, and his plea of guilty to boating under the influence.

Second, Blue Water's position depends on the proposition that Cooper spent "over 30 minutes alone in the cabin" after the allision, (Doc. 139 at 5), providing him plenty of time to become intoxicated.  Perhaps this is one construction of the evidence, but it is not the only one.  Blue Water's chronology depends upon: (1) the accident occurring at 9:30 p.m.; (2) Cooper entering the cabin within a few minutes thereafter; (3) Cooper remaining there until Officer Kelley arrived; and (4) Officer Kelley arriving at 10:11 p.m.  Only the fourth of these premises is uncontroverted.  As to the time of the accident, Rice initially stated that the Coast Guard arrived within 20 minutes after the allision, (Rice Deposition at 36), which would place the accident at 9:51 p.m.  Officer Kelley recorded the time of

the accident as 9:45 p.m. (Doc. 116, Exhibit 33 at 2, 4). Moreover, Rice testified that it was about ten minutes after the allision that Cooper entered the cabin, (Rice Deposition at 69-70), which would leave Cooper only ten to fifteen minutes in the cabin before Officer Kelley arrived. Except that Cooper did not spend the entire interval in the cabin; Rice testified only that he was in the cabin "pretty much" until the Coast Guard arrived, (*id.* at 32), and Officer Kelley testified that Cooper was on the bridge — not in the cabin — when he arrived at 10:11 p.m. (Kelley Deposition at 29-30). Rice could not even testify that Cooper was in the cabin for ten to fifteen minutes, conceding he "really ha[s] no idea how long he was in the cabin" and that it "[c]ould have been five minutes." (Rice Deposition at 44). Not even Blue Water suggests that a sober Cooper could in five minutes have become as inebriated as he was later found.

In summary, Officer Kelley's observations of Cooper's bloodshot eyes, slurred speech, and smell of alcohol are admissible and can be considered on motion for summary judgment.

### c. Field sobriety tests.

Officer Kelley transported Cooper to the office and conducted four field sobriety tests. (Kelley Deposition at 32). Cooper was able to count backwards, but he had trouble reciting a portion of the alphabet and could not count his fingers with his thumb. (*Id.* at 42-43, 49-50). Officer Kelley also administered the horizontal gaze nystagmus ("HGN") test, in which the officer has the suspect follow a moving pen with his eyes, with a jerking motion of the eyes indicating the presence of alcohol. (*Id.* at 42-44). This test "showed extreme signs of alcohol." (*Id.* at 50).

Blue Water first argues that the results of these tests are inadmissible without a predicate showing of their scientific reliability. (Doc. 128 at 4). In its reply brief, Blue Water concedes that the tests other than HGN do not require such a showing. (Doc. 137 at 8). For its part, New Hampshire concedes that the HGN test does require such a

showing.  (Doc. 133 at 10-11).[5]  Contrary to New Hampshire's assertion, Officer Kelley's testimony as to how he administers the test and what he looks for, and his testimony that he has received "some training and instruction" concerning the test, (Kelley Deposition at 44), does not adequately establish its reliability.

Blue Water's only other argument is the "remote and speculative" argument, (Doc. 137 at 8), which has been rejected for reasons that need not be repeated.

In summary, Officer Kelley's testimony that Cooper failed the finger count test and had trouble with the alphabet test is admissible and can be considered on motion for summary judgment.  The HGN test is inadmissible and cannot be considered.


### d.  Portable breath test.

Blue Water argues that this test result is inadmissible because New Hampshire has not satisfied the requirements of Alabama law.  (Doc. 128 at 4-5).  New Hampshire does not respond.  Accordingly, the results of this test will not be considered on motion for summary judgment.


### e.  Officer Kelley's opinion of Cooper's intoxication.

Officer Kelley testified that, in his opinion, Cooper was intoxicated and that his intoxication impaired his ability to operate a vessel.  (Kelley Deposition at 60-61).  Blue Water argues that Officer Kelley can render this opinion only as an expert and that New Hampshire has neither shown him to be one nor established that his opinion is the result of adequate scientific theory and practice under *Daubert*.  (Doc. 128 at 5-7).

The Court pretermits discussion of Blue Water's argument for three reasons.  First, the Court finds no indication that New Hampshire invoked this testimony in support of its motion for summary judgment or in opposition to Blue Water's motion, as none of New

---

[5]*See, e.g., United States v. Daras*, 1998 WL 726748 at *2 (4th Cir. 1998) (HGN is a scientific test and must be proved to be scientifically reliable).

Hampshire's listings of its evidence mentions this testimony.  (Doc. 111 at 5; Doc. 124 at 19-20; Doc. 141 at 9-10).

Second, Officer Kelley was not asked if Cooper was intoxicated at the time of the allision, but only whether he was intoxicated "on the night of August 1ˢᵗ, 2007."  (Kelley Deposition at 60).  Because Officer Kelley's testimony is not tied to the point of the allision, it appears to address the (later) point at which he observed and tested Cooper.  The Court finds the questioning too vague to constitute evidence of Officer Kelley's opinion of Cooper as of the time of the allision.

Third, Officer Kelley arrested Cooper for boating under the influence, New Hampshire relies on that fact,[6] and Blue Water has not objected to it.  That arrest necessarily reflects Officer Kelley's opinion that Cooper was under the influence of alcohol at the time of the allision.

In summary, Officer Kelley's testimony that Cooper was intoxicated and that his intoxication impaired his ability to operate the Vessel will not be considered on motion for summary judgment.  However, his arrest of Cooper for boating under the influence, since it is relied on by New Hampshire and not challenged by Blue Water, will be considered.

### f. Cooper's guilty plea.

The charge against Cooper fell within the jurisdiction of the District Court of Baldwin County.  On or about February 25, 2008, the district judge completed a form in which the "plea of defendant" is noted as "guilty as charged" and the "adjudication" is noted as "guilty as charged."  (Doc. 117, Exhibit 36 at 20).  Blue Water makes numerous attempts to eliminate New Hampshire's ability to rely on this evidence that Cooper pleaded guilty to boating under the influence.

First, Blue Water says the form is "confusing," because "there could [not] have

---

[6](Doc. 111 at 5; Doc. 124 at 20; Doc. 141 at 10).

-10-

been both a plea of guilty and an adjudication of guilty." (Doc. 128 at 8). This is simply incorrect. Guilty pleas are not self-executing, but rather a predicate to an adjudication of guilt. *E.g., Ex parte Eason*, 929 So. 2d 992, 993 (Ala. 2005); *see also Boykin v. Alabama*, 395 U.S. 238, 242 (1969) ("A plea of guilty ... is itself a conviction; nothing remains but to give judgment and determine punishment."). An adjudication of guilt not only is consistent with a plea of guilty but follows inexorably from such a plea.

Second, Blue Water offers the affidavit of Cooper's criminal attorney to "explai[n]" what occurred in district court. (Doc. 128 at 8). "To [counsel's] knowledge, Mr. Cooper has not pled guilty in ... the Baldwin County District Court." (Doc. 122, Exhibit J, ¶ 7). Instead, "Mr. Cooper stipulated to a prima facie case in Baldwin County District Court for the purposes of enabling him to obtain a jury trial de novo in the Baldwin County Circuit Court." (*Id.*, ¶ 5). This testimony does not eliminate the evidence that Cooper pleaded guilty but merely offers to show that the evidence is incorrect. Weighing conflicting evidence is the function of juries, not the Court. Nor is there anything inherently inconsistent between stipulating to a prima facie case and pleading guilty. *See Hodges v. State*, 667 So. 2d 145, 146 (Ala. Crim. App. 1995) (defendant "pleaded guilty and stipulated to the state's establishment of a prima facie case"), *rev'd on other grounds*, 678 So. 2d 1049 (Ala. 1996).

Third, Blue Water argues that, absent a verbatim record of the judge's colloquy with the defendant, or an executed form confirming that the defendant understands the rights he surrenders by pleading guilty, a court "cannot accept" a guilty plea. (Doc. 128 at 8). Because neither such document appears in the record of district court proceedings submitted by New Hampshire, Blue Water concludes that they do not exist and that Cooper therefore could not possibly have pleaded guilty. Assuming without deciding that Blue Water correctly reads Alabama Rule of Criminal Procedure 14.4, it addresses only the legal efficacy of Cooper's plea in his own criminal proceedings; it does not mitigate the evidentiary force of the plea in this case. Nor is the "only explanation" for the

absence of the record that Cooper did not plead guilty, (Doc. 137 at 13); judicial oversight or clerical misfiling, among other possibilities, would equally account for the absence.

Fourth, Blue Water argues that, even if Cooper did plead guilty in district court, he pleaded not guilty upon appeal to circuit court, (Doc. 117, Exhibit 36 at 10), which effectively "withdrew" any earlier guilty plea.  That withdrawal, it continues, renders the earlier guilty plea inadmissible under Federal Rule of Evidence 410.  (Doc. 128 at 9).  By its terms, however, Rule 410 precludes evidence of a withdrawn guilty plea only "against the defendant."  New Hampshire is not offering Cooper's guilty plea against Cooper but against Blue Water, and Blue Water has not attempted to show that the rule applies in that context.

In summary, the court record reflecting that Cooper pleaded guilty to boating under the influence is admissible and can be considered on motion for summary judgment.

### g.  Cooper's invocation of the Fifth Amendment.

At his June 2008 deposition, Cooper invoked the Fifth Amendment in response to every substantive question posed to him, including the following: "Were you intoxicated and disoriented on the evening of August 1, 2007 as you operated the vessel Tar Baby approaching the Perdido Pass at or near Orange Beach, Alabama?"  (Cooper Deposition at 26).

"[T]he Fifth Amendment does not forbid adverse inferences against civil litigants ... who assert the privilege against self-incrimination."  *Arango v. United States Department of the Treasury*, 115 F.3d 922, 926 n.10 (11th Cir. 1997); *accord Eagle Hospital Physicians, LLC v. SRG Consulting, Inc*., 2009 WL 613603 at *3 (11th Cir. 2009).[7]  The adverse inference, generally stated, is that the witness's testimony, had it

_____

[7]An exception to this rule exists when the witness is both a party to the civil action and a defendant in a criminal action, and invoking the Fifth Amendment would result in

been given, "would not have been favorable to the claim." *United States v. A Single Family Residence*, 803 F.2d 625, 629 n.4 (11th Cir. 1986).

Blue Water argues that the Court cannot consider an adverse inference arising from Cooper's refusal to testify, because on motion for summary judgment the Court is required to draw all reasonable inferences in its favor. (Doc. 128 at 9-10). There are at least two difficulties with this position. First, Blue Water has not identified any favorable, or even innocuous, reasonable inference that could be drawn from Cooper's invocation of the Fifth Amendment. He is charged with boating under the influence, he was asked specifically if he was guilty of that offense, and he refused to answer because he believed it would tend to incriminate him of boating under the influence.

At any rate, Blue Water's argument is based on its status as a non-movant. (Doc. 137 at 14, 15). What Blue Water overlooks is that it has filed its own competing motion for summary judgment. Whatever impediment there might be to considering the adverse inference in support of New Hampshire's motion, there can be none to considering the inference in opposition to Blue Water's own motion.

Blue Water does not deny that the adverse inference can arise not only when the witness is a party but also when the witness is not a party. Instead, it argues that the circumstances of this case, measured against the factors identified by the Second Circuit, make it inappropriate to indulge the inference here. (Doc. 128 at 11-13).

"[T]he overarching concern is fundamentally whether the adverse inference is trustworthy under all of the circumstances and will advance the search for the truth." *LiButti v. United States*, 107 F.3d 110, 124 (2nd Cir. 1997). Among the circumstances a

---

the automatic loss of the civil case on motion for summary judgment. *United States v. Two Parcels of Property*, 92 F.3d 1123, 1129 (11th Cir. 1996); *United States v. Premises Located at Route 13*, 946 F.2d 749, 756 (11th Cir. 1991). The exception does not apply here, both because Cooper is not a party to this action and because considering the adverse inference from his invocation of the Fifth Amendment would not of its own force cause Blue Water to lose its case on motion for summary judgment. Blue Water does not argue otherwise.

court should consider are "the nature of the relevant relationships," "the degree of control of the party over the non-party witness," "the compatibility of the interests of the party and non-party witness in the outcome of the litigation," and "the role of the non-party witness in the litigation."  *Id*. at 123.

The first factor assesses "loyalty" and tests how "likely the non-party witness would be to render testimony in order to damage the relationship."  107 F.3d at 123.  Blue Water emphasizes that, because Cooper has been fired, there is no relationship left to damage.  (Doc. 128 at 11).  That fact does not, as Blue Water appears to believe, show that Cooper had an incentive to falsely claim the Fifth Amendment in order to torpedo Blue Water's case.  First, Cooper was not imagining (or pretending to imagine) a fanciful future prosecution but was responding to an actual, ongoing prosecution.  Second, Cooper did not dream up a Fifth Amendment response on his own but invoked his constitutional right because his lawyer in the criminal case advised him it would be in his own best interest to do so.  (Cooper Deposition at 5, 27).  Third, and as discussed below, Cooper had no incentive to injure Blue Water's case with false inferences of his intoxication, because a denial of insurance benefits will leave Blue Water looking to Cooper to cover the seven-figure loss.

Blue Water mistakenly interprets the second factor as directed to the party's post-event ability to control the witness's conduct and testimony.  (Doc. 128 at 11).  On the contrary, this factor addresses the degree of control the party "has vested in the non-party witness in regard to the key facts and general subject matter of the litigation" and approximates the analysis for admissions of a party-opponent under Federal Rule of Evidence 801(d)(2).  107 F.3d at 123.  The general subject matter of the litigation is the operation of the Vessel while intoxicated, and Blue Water vested in Cooper the responsibility to operate the Vessel and to do so liquor-free.  Moreover, as discussed in Part I.A.1.a, Cooper's statements concerning his drinking satisfy Rule 801(d)(2).

The third factor evaluates whether the witness "is pragmatically a noncaptioned

party in interest" and whether the assertion of the privilege "advances the interests of both the non-party witness and the affected party in the outcome of the litigation."  107 F.3d at 123.  Blue Water posits without explanation that Cooper has no interest in this litigation. (Doc. 128 at 11-12).  In fact, he has a great deal of interest.  Should Blue Water not obtain insurance proceeds, Cooper will be the obvious target for recouping some portion of the seven-figure loss.  Cooper therefore shares Blue Water's incentive to show that he was not intoxicated, and his invocation of the Fifth Amendment, when it would be in his financial and professional self-interest to deny alcohol consumption, suggests the validity of the adverse inference.

The fourth factor considers whether the witness was a "key figure in the litigation and played a controlling role in any of its underlying aspects."  107 F.3d at 123.  Blue Water admits this factor favors consideration of the adverse inference.  (Doc. 128 at 12).

Noting that *LiButti*'s factors are non-exclusive, 107 F.3d at 123, Blue Water suggests a few more.  First, Blue Water finds it significant that Cooper was not accompanied by counsel at his deposition "and consequently could not know what questions he could or could not answer without incriminating himself."  (Doc. 128 at 12). The argument might have traction with respect to questions on the fringes of his potential criminal liability, but the question quoted above, which is the genesis of the adverse inference, could not be more directly incriminating.

In a related vein, Blue Water suggests that counsel took advantage of Cooper by continuing to question him knowing full well he would invoke his right not to incriminate himself, which allowed counsel "to frame his questions to obtain the adverse inferences most favorable to New Hampshire."  (Doc. 128 at 12).  This is no doubt some danger when an attorney asks questions far afield and elicits programmed Fifth Amendment invocations,[8] but again the only question with which the Court is concerned is central to

---

[8]*See Rad Services, Inc. v. Aetna Casualty & Surety Co*., 808 F.2d 271, 277-78 (3rd Cir. 1986) (warning against "sharp practices" by which counsel "effectively testifies for

Cooper's criminal liability and could not have been framed more simply or neutrally.

Finally, Blue Water points to the "overarching concern" with advancing the search for truth.  Because Rice has testified that Cooper was not intoxicated, Blue Water concludes that considering an adverse inference from Cooper's invocation of the Fifth Amendment "would not advance" that search.  (Doc. 128 at 12).  Blue Water does not explain how the search for truth is advanced by treating the testimony of any one witness as sacrosanct, especially one with as much incentive to prevaricate as Rice.  On the contrary, "[w]hatever their origins, these exceptions to the demand for every man's evidence are not lightly created or expansively construed, because they are in derogation of the search for truth."  *United States v. Nixon*, 418 U.S. 683, 710 (1974).

In summary, Cooper's invocation of the Fifth Amendment in response to the question quoted above is admissible, and an adverse inference arising therefrom can be considered on motion for summary judgment.


### 2.  Evaluation of the evidence.

In deciding Blue Water's motion for summary judgment, the Court is required to view the evidence and the reasonable inferences therefrom in the light most favorable to New Hampshire.  *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003).  So viewed, there is plainly a genuine issue of material fact as to whether Cooper was intoxicated at the time of the allision.

First, Cooper admitted having a "couple of" drinks shortly before setting sail approximately three hours before the allision.  These were not beers, as Blue Water maintains, but hard liquor drinks.  Blue Water insists that the effect of these drinks would have dissipated before the allision, but it relies for this proposition on the opinion of its expert, who erroneously believed the drinks were beer.  (Zettl Deposition at 42).  Moreover, Blue Water mistakenly believes that, because a plainly inebriated Cooper

the invoking witness").

admitted he'd had "a couple," the jury would be foreclosed from finding that he had more than precisely two.  Likewise, Blue Water incorrectly assumes that, because Cooper admitted drinking shortly before taking the helm, the jury would be foreclosed from finding that he drank afterwards.  The key point in Cooper's statement is his admission that he drank before the allision; the jury would be free to accept that proposition but reject his attempts to cabin the quantity and timing of his consumption.

Second, Cooper's statement concerning his drinking came in response to a law enforcement officer's question as to "how much he had had to drink."  According to Blue Water and its expert, the correct answer to this question would have been "between 4½ and 5½ shots of whiskey or 40 percent alcohol[ic] beverage," all consumed after the allision.  (Zettl Deposition at 40).  Cooper had every incentive to give this answer if it was true, because drinking after an accident is not a crime, while operating a vessel when intoxicated is a crime.  That Cooper did not tell Officer Kelley that his drinking occurred after the allision is thus significant evidence that it occurred beforehand.

Third, Rice's testimony that he did not observe Cooper drinking during the trip and did not observe any manifestations of drinking is not as powerful as Blue Water portrays it.  As discussed above, Officer Kelley observed that Rice's eyes were bloodshot and his speech slurred after the accident.  Since Rice never suggested he entered the cabin or had a drink after the allision, his apparent intoxication could arise only from his having consumed alcohol prior to the allision, and he admits operating the Vessel shortly before the allision.  Even if Rice had not been drinking, he would bear moral and perhaps legal responsibility if he allowed Cooper to operate the Vessel while intoxicated.  Either way, Rice would have an incentive to deny that Cooper had been drinking even if he knew otherwise.

Fourth, Blue Water's theory that Cooper's alcohol consumption occurred only after the allision is less than watertight.  Rice at one point admitted that Cooper could have been in the cabin as briefly as five minutes, and not even Blue Water suggests that

he could have, in that brief interval, downed the five or six shots of whiskey that its expert says would have been required to generate the blood alcohol level measured on the Draeger breathalyzer test.  Moreover, although Rice testified that Cooper was in the cabin, Officer Kelley testified that Cooper was on the bridge, not in the cabin, when he arrived.  Even were the jury to accept that Cooper was alone in the cabin a full 30 minutes, as Blue Water would have it, Rice has no personal knowledge of what he was doing there, and he admits it would have been out of character for Cooper to drink under the circumstances.  (Rice Deposition at 48).  Moreover, the cabin contained not merely alcohol but the kitchen, the bathroom, and the bedroom, so Cooper had plenty of options.  If he were trying to sober up, he could brew some coffee or fix a sandwich.  If he were nauseated, he could use the restroom.  If he were sick, tired, or merely disgusted, he could lie down, as he did shortly before the allision.  (*Id*. at 20).[9]

Fifth, Officer Kelley's observations of Cooper's odor, bloodshot eyes, and slurred speech, as well as his inability to count his fingers with his thumbs or accurately recite a portion of the alphabet, are of course consistent with intoxication.  Blue Water's remoteness argument has already been addressed and rejected for want of support.

Sixth, Officer Kelley's arrest of Cooper for boating under the influence reflects his opinion that Cooper was under the influence at the time of the allision.  As noted previously, New Hampshire offered this evidence and Blue Water did not object to it.

Seventh, Cooper recorded a blood alcohol content of 0.14 on a Draeger breathalyzer test, the validity of which Blue Water does not challenge.  (Doc. 116, Exhibit 34; Zettl Deposition at 8-9).  In its reply brief, Blue Water for the first time suggests the results are "not sufficient to prove intoxication" absent expert testimony relating the results back to that point in time.  (Doc. 139 at 6-7).  This argument comes too late to be

---

[9]Blue Water stresses its expert's opinion that post-allision drinking is "the only scientific explanation" for Cooper's inebriation.  (Doc. 127 at 20-21).  His opinion, however, is expressly conditioned on the veracity of Rice's testimony that Cooper did not drink before the allision.  (Zettl Deposition at 40).

considered,[10] but in any event Blue Water's own authorities recognize that the time lag between accident and testing goes only to the weight of the evidence, not its admissibility. The Court notes the Draeger evidence only as part of the puzzle (which it is, even by Blue Water's authorities), not as independently dispositive of intoxication.

Eighth, Cooper pleaded guilty to the crime of boating under the influence, which necessarily reflects that he was under the influence at the time of the allision.  Blue Water's efforts to exclude this evidence have already been rejected.

Ninth, Cooper invoked the Fifth Amendment's protection against self-incrimination in refusing to answer the question whether he had been intoxicated at the time of the allision.  The jury is entitled to draw from Cooper's conduct the adverse inference that, had he answered the question and done so truthfully, it would have exposed that he was intoxicated at the critical time.

Any small subset of these items would be sufficient to create a genuine issue of material fact.  Together, they create an impressive one.  Accordingly, Blue Water's motion for summary judgment is due to be denied.

In deciding New Hampshire's motion for summary judgment, however, the Court must reverse field and view the evidence and reasonable inferences therefrom in the light most favorable to Blue Water.  So viewed, Blue Water has shown a genuine issue of material fact as to Cooper's intoxication.  The jury is of course free to accept Rice's testimony that Cooper never drank on the Vessel and displayed no signs of intoxication, and it is free to conclude that the intoxication observed and tested by Officer Kelley derived solely from alcohol consumption after the allision, when Cooper, according to Blue Water's version of the evidence, had the motive, the opportunity, and the time to drink heavily.   Accordingly, New Hampshire's motion for summary judgment is due to be denied.

---

[10]*Mariano v. Potter*, 2006 WL 907772 at *3 & n.6 (S.D. Ala. 2006).

## B.  Delivery of the Policy.

> Subject to the insurer's requirements as to payment of premium, every policy shall be mailed or delivered to the insured or to the person entitled thereto within a reasonable period of time after its issuance, except where a condition required by the insurer has not been met by the insured.

Ala. Code § 27-14-19(a).  "We conclude that when an insurer has not complied with § 27-14-19 and its failure to comply has prejudiced the insured, the insurer may be estopped from asserting an otherwise valid coverage exclusion."  *Brown Machinery Works & Supply Co. v. Insurance Company of North America*, 659 So. 2d 51, 58 (Ala. 1995).  Blue Water argues that it did not receive the Policy, that it was prejudiced by the failure, and that New Hampshire is therefore estopped to rely on the Policy exclusions.  (Doc. 108 at 21-23).

New Hampshire points out that Section 27-14-19 does not apply to "[w]et marine and transportation insurance," Ala. Code § 27-14-2(3), and that wet marine and transportation insurance includes "[i]nsurance upon vessels," *id*. § 27-5-9(1), which certainly includes the Vessel here.  So far, so good, but the Alabama Insurance Code further provides that "certain insurance coverages may come within the definitions of two or more kinds of insurance as defined in this chapter, and the inclusion of such coverage within one definition shall not exclude it as to any other kind of insurance within the definition of which such coverage is likewise reasonably includable."  *Id*. § 27-5-1(a).  "Property insurance" is defined to include "insurance on real or personal property of every kind and of every interest therein, whether on land, water or in the air, against loss or damage from any and every hazard or cause."  *Id*. § 27-5-5.  Because the Policy is one of property insurance as well as wet marine and transportation insurance, and because Section 27-14-2 does not exclude property insurance policies from the operation of

-20-

Section 27-14-19, that section does apply to the Policy.[11]

John Harper is and was a member of Blue Water.  Blue Water requested Trip Wheelless with the Flowers Insurance Agency ("Flowers") to obtain quotes on yacht insurance.  Wheelless contacted Bill Hodgens, and the Policy was secured on February 13, 2007.  (Doc. 127 at 3-5).

Donna Phillips is an employee of Flowers.  (Doc. 115, Exhibit 19 at 2).  On February 13, 2007, Hodgens e-mailed the Policy to Phillips.  (Hodgens Deposition at 24-26).  Phillips responded, "Thank you very much.  I'll advise Trip."  (Doc. 115, Exhibit 19 at 2; Hodgens Deposition at 29-30).  Also on February 13, 2007, Hodgens telefaxed the Policy to Phillips.  (*Id.* at 31-32; Doc. 116, Exhibit 21).  On February 14, 2007, Phillips made the following entry in the Customer Activities Listing for Harper:  "Boat policy attached."  (Doc. 115, Exhibit 20 at 4).  On February 15, 2007, Hodgens mailed the Policy to Wheelless.  (Hodgens Deposition at 47-48, 112-13, 134).  There is thus ample evidence that Wheelless was "mailed or delivered" a copy of the Policy "within a reasonable period of time after its issuance."   Blue Water concedes the point.  (Doc. 127 at 28 n.9; Doc. 139 at 11 n.6).[12]

Wheelless denies ever forwarding the Policy to Harper.  (Wheelless Deposition at

_____

[11]Although unnecessary to the Court's decision, following the plain meaning of the statutes does not, as New Hampshire suggests, "read out" Section 27-14-2's exclusion for wet marine and transportation policies.  (Doc. 141 at 12).  The argument assumes that all wet marine and transportation insurance is property insurance, but that is far from clear. Included within the former definition are "contracts of marine protection and indemnity insurance."  Ala. Code § 27-5-9(1)(2).  Such policies guard against liability for personal or property damage caused by a vessel, *e.g., Aqua-Marine Constructors, Inc. v. Banks*, 110 F.3d 663, 676 (9th Cir. 1997); *Steelmet, Inc. v. Caribe Towing Corp.*, 842 F.2d 1237, 1244 (11th Cir. 1988), and so do not constitute "property insurance" under Section 27-5-5.

[12]Blue Water addresses the foregoing evidence only by questioning whether Phillips ever received the Policy by telefax.  (Doc. 128 at 14; Doc. 137 at 18-20).  Since her own entry acknowledges she received the Policy, it can scarcely matter whether she received it by telefax or by e-mail.

85-86).  For purposes of Section 27-14-19, however, delivery to the agent of the insured is delivery to the insured.  *Southern Foodservice Management, Inc. v. American Fidelity Assurance Co.*, 850 So. 2d 316, 321 (Ala. 2002).  Therefore, if Wheelless was Harper's agent for purposes of receiving the Policy, mailing or delivery to him constituted compliance with the statute.[13]

To be an agent, one must have express, implied or apparent authority to act for the principal.  *E.g., Cook's Pest Control, Inc. v. Rebar*, 852 So. 2d 730, 747 (Ala. 2002). Express and implied authority are forms of actual authority, while apparent authority rests on estoppel.  *McLemore v. Hyundai Motor Manufacturing, LLC*, 2008 WL 4531796 at **7-8 (Ala. 2008) (internal quotes omitted).  "The party asserting agency has the burden of presenting sufficient evidence to prove its existence."  *Ex parte Steadman*, 812 So. 2d 290, 294 (Ala. 2001).  Wheelless and Harper deny that Blue Water authorized Wheelless to receive the Policy, (Wheelless Deposition at 87; Doc. 108, Exhibit B, ¶ 7), and Blue Water concludes that this eliminates New Hampshire's ability to establish agency.  (Doc. 127 at 28-29).

New Hampshire, however, points to Phillips' e-mail of February 14, 2007, which states that "Trip has asked that all correspondence go through the office here ....  We handle all this clients [sic] business and personal insurance and this is how the client prefers his mail."  (Doc. 116, Exhibit 22 at 3).  E-mails, telefaxes, and mailings of the Policy would appear to be "correspondence" concerning the Policy, and Blue Water has not offered to explain how a request that "all correspondence" be directed to Flowers,

_____

[13]New Hampshire suggests that sending the Policy to Wheelless satisfied the statute even if he was not Blue Water's agent for delivery, on the theory that he was "the person entitled thereto."  (Doc. 124 at 31).  New Hampshire offers no analysis or authority to support its position, which appears precluded by *Brown Machinery*'s holding that Section 27-14-19 "requires that the insurance policy be 'mailed or delivered' to the purchaser of a policy and to the named insured."  659 So. 2d at 61.  Even if Wheelless constitutes a person entitled to the Policy, unless he is also an agent for delivery, New Hampshire did not mail or deliver the Policy to the purchaser and named insured.

because it represents Harper's preference, could fail to constitute evidence that Wheeless was actually authorized to receive the Policy.  Given Blue Water's failure to address this evidence, it is unnecessary for the Court to review the other evidence and argument presented by New Hampshire concerning agency.

In summary, although Section 27-14-19 applies, on the present record and argument there is a genuine issue of material fact as to whether New Hampshire complied with its provisions.  These conclusions obviate any consideration of prejudice to Blue Water.  Blue Water is not entitled to summary judgment on the grounds that New Hampshire is estopped to rely on the exclusions.


### C.  Incorrect Policy.

The complaint alleges that New Hampshire "issued a Yacht Policy of insurance, Policy No. YM 868-44-60."  (Doc. 1, ¶ 8).  A "copy of said policy" was attached as an exhibit to the complaint.  (*Id.*, ¶ 10 & Exhibit A).  The complaint alleges that "[t]he subject Yacht Policy" contains two exclusions, which it then quotes, citing to Exhibit A. (*Id.*, ¶¶ 23-24, 27-28).

As it turns out, Exhibit A to the complaint is a yacht policy form dated August 2006, (Doc. 1, Exhibit A at 20), while the actual Policy is a form dated July 1999.  (Doc. 115, Exhibit 11, 11-A at 20).  Blue Water briefly asserts — without argument or authority — that this disparity requires summary judgment in its favor because New Hampshire "has pled the wrong policy."  (Doc. 108 at 23-24).  After New Hampshire challenged this position, Blue Water elected not to address it in its reply brief.

Assuming without deciding that Blue Water has not thereby abandoned the argument, the Court rejects it.  New Hampshire has not "pled the wrong policy," because it pleaded, and sues on, Policy No. YM 868-44-60, not Exhibit A.  That Exhibit A is not in fact the policy that New Hampshire issued may constitute a factual error that Blue

Water could deny in its answer,[14] but it does not convert New Hampshire's claim into one grounded on Exhibit A rather than on YM 868-44-60.[15]

## II. Bad Faith.

Alabama recognizes two broad forms of the tort of bad faith: the "normal" or "ordinary" case and the "abnormal" or "extraordinary" one.  *E.g., Acceptance Insurance Co. v. Brown*, 832 So. 2d 1, 15-16 (Ala. 2001); *Employees' Benefit Association v. Grissett*, 732 So. 2d 968, 976 (Ala. 1998).  Certain elements are common to both forms: (1) the existence of an insurance contract between the parties; (2) an intentional refusal to pay the insured's claim; and (3) the insured's contractual entitlement to payment of the claim.  *State Farm Fire & Casualty Co. v. Slade,* 747 So. 2d 293, 304, 316-18 (Ala. 1999).  Beyond this point, the elements diverge.

In the normal case, the insured must show  "the absence of any reasonably legitimate or arguable reason for that refusal (the absence of a debatable reason)." *Blackburn v. Fidelity & Deposit Co.*, 661 So. 2d 661, 667 (Ala. 1995) (internal quotes omitted).  A debatable or arguable reason is "a reason that is open to dispute or question." *Koch v. State Farm Fire & Casualty Co.*, 565 So. 2d 226, 229 n.4 (Ala. 1990). "When a claim is 'fairly debatable,' the insurer is entitled to debate it, whether the debate concerns a matter of fact or law."  *Davis v. Cotton States Mutual Insurance Co.*, 604 So. 2d 354, 358-59 (Ala. 1992) (internal quotes omitted).  The burden on the plaintiff arguing the absence of a debatable reason is so great that, "in the 'normal' case, a plaintiff's bad-faith claim may not be submitted to the jury unless she shows that she is entitled to a directed

---

[14]In fact, Blue Water admitted that New Hampshire issued Policy YM 868-44-60 and denied that Exhibit A is that policy.  (Doc. 13, ¶¶ 8, 10).

[15]There is no substantive difference between the exclusions in the Policy and in Exhibit A.  One exclusion is verbatim the same, the other essentially so.  *Compare* Doc. 1, Exhibit A at 25 *with* Doc. 115, Exhibit 11-A at 24.

verdict on the contract claim." *Alfa Mutual Fire Insurance Co. v. Thomas*, 738 So. 2d 815, 822 (Ala. 1999).

The abnormal case is premised on "countervailing policy considerations that weig[h] in favor of the insured's right to have his claim properly evaluated and promptly paid," *Brown*, 832 So. 2d at 16 (internal quotes omitted), which would not be upheld were the insurer always able to escape liability by showing a debatable reason for its denial. Thus, "[t]he rule in [extraordinary] cases dispensed with the predicate of a preverdict JML [judgment as a matter of law] for the plaintiff on the contract claim if the insurer had recklessly or intentionally failed to properly investigate a claim or to subject the results of its investigation to a cognitive evaluation." *Id.* (internal quotes omitted).  Blue Water alleges only the abnormal form of bad faith.  (Doc. 127 at 34).

### A.  Denial.

An element of an abnormal claim of bad faith is the denial of the insured's claim, which can be either express (or actual) or constructive.  *Slade*, 747 So. 2d at 317 n.6.  The Court has previously ruled out a constructive denial based on the inadequacy of Blue Water's pleading.  (Doc. 24 at 5).  Blue Water relies for an express denial on a letter from New Hampshire dated August 3, 2007.  (Doc. 127 at 34).  That document reads in pertinent part as follows:

> We acknowledge receipt of your first notice of loss dated August 2, 2007 and advise this matter is being handled under a full reservation of rights.
> Please be advised we have engaged the services of Mr. Mike Schiehl ... a marine surveyor ... to investigate the referenced casualty.  The factual information contained herein is based upon Mr. Schiehl's investigation to date, which includes discussions with the various authorities involved ....
> ... Mr. Schiehl reports that Captain Cooper was arrested for "BUI" (Boating Under the Influence").  The local media have also reported the arrest of Captain Cooper for BUI.
> [a recitation of policy provisions]
> Based on the foregoing, [the damage would normally be considered

an "occurrence"].  However, when read in connection with the "CAUSES
OF LOSS THAT ARE NOT COVERED," it appears that coverage will
not lie for the subject casualty.  This is based on the fact that Captain
James Cooper, based on the employment assumptions noted above, may
have operated the TAR BABY while under the influence.  ...

     Due to the allegations presented to date, New Hampshire Insurance
Company will be handling this matter without prejudice to any and all
rights, claims and defenses that inure to the benefit of New Hampshire
Insurance Company under its policy or otherwise, all of which rights,
claims and defenses are hereby reserved.  This correspondence is not
intended to be, nor should it be construed as an exhaustive listing of
the policy terms, conditions or exclusions that may preclude coverage
for these matters under New Hampshire's policy.

     Our coverage position has been based on information presented
to date.  If you are aware of any facts or theories, which you feel we
should consider, please forward these to us for consideration.

(Doc. 117, Exhibit 40).

Whether the insurer actually denied a claim is a question of fact.  *Jones v. Alfa
Mutual Insurance Co.*, 2008 WL 2406132 at *8 (Ala. 2008).  New Hampshire maintains
that this letter as a matter of law could not constitute a denial because: (1) it does not use
the word; (2) Susan Smith, who wrote it, did not intend it as a denial letter but described it
as a "reservation of rights"; (3) Blue Water's original counsel also referred to the August
3 letter as a reservation of rights letter; (4) New Hampshire's counsel clarified the
meaning of the letter in a subsequent letter; and (5) New Hampshire in fact continued to
investigate the claim up to the point it filed this declaratory action.  (Doc. 111 at 17-18).
The Court finds New Hampshire's argument too skeletal to carry the day on motion for
summary judgment.

Denial letters "typically ...explicitly state that the claim has been denied."  *Jones*,
2008 WL 2406132 at *7.  The flip side, of course, is that denial letters sometimes do not
explicitly state that the claim has been denied.  The letter does employ the phrase
"reservation of rights," but New Hampshire has not shown that this term is mutually
exclusive with a denial.  *See generally* 13-14 L.R. Russ & T.F. Segalla, Couch on

Insurance §§ 195.45, 195.55, 198.35 (3rd ed. 1999) (indicating that denial letters may also reserve rights). Counsel's August 7 letter states that "the Insurer is reserving all rights under the policy pending full investigation of the subject casualty. No determination regarding coverage for the matter has been made." (Doc. 117, Exhibit 41). Had this language been included in the August 3 letter, there might be no question whether it constituted a denial. But it was not, and New Hampshire has not explained how counsel's post hoc interpretation, or its actual continued investigation, can as a matter of law remove any fact issue over the letter's meaning.

The August 3 letter does not state that no final decision as to coverage vel non has been made, even though Smith testified it is her general practice to include that language when she intends to reserve rights without denying coverage, and even though her training required her to do so. (Smith Deposition at 50-51). Instead, the letter states that "it appears that coverage will not lie for the subject casualty." Smith admits that reasonable persons could understand the letter as a denial of coverage. (*Id*. at 62).

In summary, New Hampshire has failed to show the absence of a genuine issue of material fact as to whether it denied Blue Water's claim on August 3, 2007.

### B. Investigation.

New Hampshire rattles off a list of steps it took to investigate Blue Water's claim. (Doc. 111 at 27). All of this activity, however, postdates the August 3 letter. "[I]n determining whether a claim involves a bad-faith failure to investigate, the date of denial is crucial because information received by the insurer after the date of the denial is irrelevant to the determination of whether the insurer denied at that date in bad faith." *Slade*, 747 So. 2d at 317 n.6 (internal quotes omitted).

New Hampshire next notes that, "in order to prove a bad faith failure-to-investigate claim, the insured must prove that a proper investigation would have revealed that the insured's loss was covered under the terms of the contract." *Slade*, 747 So. 2d at

318.  New Hampshire argues that, given its evidence of intoxication as discussed in Part I, a proper, post-August 3 investigation would not have revealed coverage.  (Doc. 111 at 27-28).  The quoted language from *Slade*, however, means only that, in order to prevail on a claim of abnormal bad faith, the insured must show that the insurer breached the contract by refusing to pay the claim.  747 So. 2d at 317-18.  Because New Hampshire is not entitled to judgment as a matter of law on the contract claim, it has not established that Blue Water cannot make the required showing.

Finally, New Hampshire posits that Blue Water cannot "point to any 'dishonest purpose' on the part of New Hampshire with respect to the handling of Blue Water's claim."  (Doc. 111 at 28).  "The moving party bears the initial burden to show the district court, *by reference to materials on file*, that there are no genuine issues of material fact that should be decided at trial. ...  *Even after* Celotex *it is never enough simply to state that the non-moving party cannot meet its burden at trial*."  *Clark v. Coats & Clark, Inc*., 929 F.2d 604, 608 (11th Cir. 1991) (emphasis added); *accord Mullins v. Crowell*, 228 F.3d 1305, 1313 (11th Cir. 2000).  New Hampshire has not pointed to any materials on file, it has merely pointed to Blue Water and so has failed to meet its initial burden.  Nor has New Hampshire explained how denying a claim the day after receiving it, based solely on Cooper's arrest, is incompatible with a dishonest purpose.

In summary, New Hampshire is not entitled to summary judgment on Blue Water's bad faith claim.

## CONCLUSION

For the reasons set forth above, New Hampshire's motion for summary judgment is **denied** and Blue Water's motion for partial summary judgment is **denied**.[16]

---

[16]For the reasons set forth in Part I.A.1, Blue Water's motion to strike evidence concerning Cooper's intoxication, (Doc. 128 at 2-13), is **granted** with respect to the HGN test, the portable breath test, and Officer Kelley's opinion of Cooper's intoxication, and **denied** in all other respects.  For the reasons set forth in Part I.C, Blue Water's motion to

DONE and ORDERED this 20th day of March, 2009.

s/ WILLIAM H. STEELE
UNITED STATES DISTRICT JUDGE

---

strike the 1999 policy form, (*id*. at 13), is **denied**.  The balance of Blue Water's motion to strike is **denied as moot**, since the Court did not rely on the challenged evidence in ruling on the motions for summary judgment.  Blue Water's second motion to strike, (Doc. 138), which is redundant to its first, is **denied as moot**.

Blue Water's motion for leave to file opposition to New Hampshire's motion to strike, (Doc. 144), is **granted**.  New Hampshire's motion for leave to file a reply, (Doc. 145), is **granted**.  New Hampshire's motion to strike, (Doc. 140), is **denied as moot**, as the evidence at issue was not considered by the Court and/or did not affect the resolution of the motions for summary judgment.