IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| NEW HAMPSHIRE INSURANCE COMPANY, ) ) ) | |
| Plaintiff, ) ) | |
| v. ) ) | CIVIL ACTION 07-0754-WS-M |
| BLUE WATER OFF SHORE, LLC, ) ) | |
| Defendant. ) | |

## ORDER

This matter is before the Court on three motions in limine filed by the parties, (Docs. 150-52), each arguing that certain expert testimony is due to be excluded under Federal Rule of Evidence 702, as amplified by *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and like cases. The parties have filed objections to each motion, (Docs. 157-59), and they are ripe for resolution.

## BACKGROUND

Blue Water owned the TAR BABY, a 61-foot yacht ("the Vessel"). Blue Water obtained a policy of insurance on the vessel ("the Policy"), with New Hampshire as the insurer. The Policy contained an exclusion for losses arising from any intentional misuse or misconduct, or lack of reasonable care or due diligence, in the operation of the Vessel. It contained another exclusion for losses arising from the criminal act of the insured's employee.

On the night of August 1, 2007, the Vessel approached Perdido Pass from the east after sailing from Panama City, with Captain James Cooper at the helm and mate Ronald Rice also on board. The Vessel did not enter the pass from the south through the marked channel but from the east, where it allided with a submerged wall marking the eastern edge of the pass. Officer Jody Kelley of the Alabama Marine Police arrested Cooper for

boating under the influence in violation of Alabama law.

New Hampshire filed this declaratory action in October 2007, seeking a declaration that coverage is excluded because Cooper was operating the Vessel under the influence of alcohol at the time of the allision. (Doc. 1 at 5-8). Blue Water counterclaimed for breach of contract and bad faith, seeking policy limits of $1.75 million, additional compensatory damages exceeding $250,000, and punitive damages of approximately $3 million. (Doc. 13 at 9-10).

Blue Water challenges Kelley's ability to offer expert opinions that Cooper was intoxicated at the time of the allision and that Cooper's intoxication caused the allision. Blue Water also challenges the ability of Michael Schiehl to offer expert opinions that the allision occurred as a result of navigational error, that Cooper was intoxicated at the time of the allision, that the most probable cause of the navigational error was Cooper's intoxication, and that the Vessel was traveling at a high rate of speed when the allision occurred. New Hampshire challenges the ability of James Turner to offer expert opinions that an August 3, 2007 letter constituted a denial of Blue Water's claim, that a statement that "no final decision as to coverage has been made" (which does not appear in the letter) is essential to a reservation of rights letter, and that portions of the letter mentioning a reservation of rights reflect only "lip service."

## DISCUSSION

The requirements for the admission of expert testimony in light of *Daubert* are well known and need not be regurgitated at length herein. "Expert testimony may be admitted into evidence if: (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical or specialized expertise, to understand the evidence or to determine a

fact in issue." *City of Tuscaloosa v. Harcros Chemicals, Inc.*, 158 F.3d 548, 562 (11th Cir. 1998) (footnote omitted).  There are thus three discrete inquiries:  qualifications, relevance, and reliability.[1]  The burden of establishing these three requisites lies with the proponent.  *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (en banc).

An expert may be qualified "by knowledge, skill, experience, training, or education."  Fed. R. Evid. 702.  An expert is not necessarily unqualified simply because his experience does not precisely match the matter at hand.  *See Maiz v. Virani*, 253 F.3d 641, 665 (11th Cir. 2001) (an economic expert was qualified even though he "ha[d] no real estate development experience and thus no basis to opine regarding how the pilfered funds would have been invested by the Plaintiffs").

To the requirement of Rule 401 that evidence possess a "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable," Rule 702 adds that expert evidence must "assist the trier of fact to understand the evidence or to determine a fact in issue."  The evidence must "concern matters that are beyond the understanding of the average lay person. ... Proffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments."  *United States v. Frazier*, 387 F.3d at 1262-63.  In addition, the expert evidence "must have a valid scientific connection to the disputed facts in the case."  *Allison v. McGhan Medical Corp.*, 184 F.3d 1300, 1312 (11th Cir. 1999).  That is, there must be an adequate "fit" between the evidence and the case, which may be lacking, for example, when the expert attempts to extrapolate animal studies into the human sphere.  *Rider v. Sandoz Pharmaceuticals Corp.*, 295 F.3d 1194, 1202 (11th Cir. 2002).

The most heavily litigated component of the *Daubert* analysis is reliability.  Expert

---

[1]*See Quiet Technology DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003) (although there is "some overlap" among these inquiries, they "are distinct concepts that courts and litigants must take care not to conflate").

testimony "must be 'scientific,' meaning grounded in the methods and procedures of science, and must constitute 'knowledge,' meaning more than subjective belief or unsupported assumptions."  *McDowell v. Brown*, 392 F.3d 1283, 1298 (11th Cir. 2004). Rule 702 identifies three components of the reliability element: "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."

*Daubert* identifies several non-exclusive factors that a court may consider as appropriate in gauging the reliability of the principles and methods utilized by the expert: (1) whether the methodology has been, or is amenable to, testing; (2) whether it has been subjected to peer review and/or publication; (3) the known and potential error rate of the methodology; and (4) whether it has been generally accepted in the relevant scientific community.  509 U.S. at 593-94.  "Notably, ... these factors do not exhaust the universe of considerations that may bear on the reliability of a given expert opinion, and a federal court should consider any additional factors that may advance its Rule 702 analysis." *Quiet Technology DC-8, Inc.  v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003).  Among such factors, "[i]n evaluating the reliability of an expert's method, ... a district court may properly consider whether the expert's methodology has been contrived to reach a particular result."  *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1293 n.7 (11th Cir. 2005).

Whatever factors are considered, the Court's focus should "be solely on principles and methodology, not the conclusions they generate."  *Allison*, 184 F.3d at 1312 (internal quotes omitted).  It is therefore error to conflate admissibility with credibility, as by considering the relative weight of competing experts and their opinions.  *Quiet Technology*, 326 F.3d at 1341.  Thus, for example, "a district court may not exclude an expert because it believes the expert lacks personal credibility because of prior bad acts or other prior instances of untruthfulness."  *Rink*, 400 F.3d at 1293 n.7.

With respect to the third reliability criterion of Rule 702, errors in an expert's application of a reliable method generally implicate credibility rather than reliability. *See Quiet Technology*, 326 F.3d at 1345-46 (using incorrect numbers in a reliable formula is not grounds for exclusion under *Daubert*).

Certain additional observations are worth making. "Presenting a summary of a proffered expert's testimony in the form of conclusory statements devoid of factual or analytical support is simply not enough [to carry the proponent's burden]." *Cook ex rel. Estate of Tessier v. Sheriff of Monroe County*, 402 F.3d 1092, 1113 (11th Cir. 2005). Similarly, "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the ipse dixit of the expert." *Id.* at 1111 (internal quotes omitted). An expert's unexplained assurance that her opinions rest on accepted principles fares no better. *McClain v. Metabolife International, Inc.*, 401 F.3d 1233, 1222 (11th Cir. 2005).[2]

Neither side has requested a hearing. A trial court's decision whether to hold such a hearing is committed to its sound discretion, *Cook*, 402 F.3d at 1113, and absent a request the Court concludes that no hearing is required. *Cf. id.* at 1108, 1114 (no abuse of discretion in failing to hold a hearing when not requested). Even when a hearing is requested, the court has discretion to deny the request, especially when the case is not a complicated one involving multiple expert witnesses. *E.g., United States v. Hansen*, 262 F.3d 1217, 1234 (11th Cir. 2001). Although there are multiple expert witnesses in this case, their testimony is not particularly complicated, especially compared with those cases involving dueling medical evidence as to which a hearing may be a fruitful exercise. *See id.* (trial court should grant a motion for hearing when the opponent presents conflicting medical literature and expert testimony).

---

[2]The parties' presentations are more narrow than the Court's overview, and the Court will not apply to the motions specific arguments the parties could have, but did not, expressly raise.

**I. Jody Kelley.**

New Hampshire concedes that Kelley cannot testify as an expert that Cooper was intoxicated at the time of the accident or that Cooper's intoxication caused the allision. (Doc. 159 at 1, 5-6, 8-9). Accordingly, Blue Water's motion in limine is due to be granted.[3]

**II. Michael Schiehl.**

As noted, Blue Water challenges Schiehl's ability to offer expert opinions that the allision occurred as a result of navigational error, that Cooper was intoxicated at the time, that the most probable cause of the navigational error was Cooper's intoxication, and that the Vessel was traveling at a high rate of speed when the allision occurred.

    **A. Navigational Error.**

Blue Water argues that Schiehl is unqualified to opine that the allision was caused by navigational error. The record reflects that Schiehl: went through two or more two-week maritime accident reconstruction courses, (Schiehl Deposition at 58, 64-65, 68); spent a year in the Coast Guard investigating vessel casualties, (*id*. at 37, 39, 41, 67); and has performed approximately 1,500 marine accident reconstructions or causal analyses since leaving the Coast Guard. (*Id*. at 83-84).

Blue Water ignores these portions of Schiehl's history and does not explain how they could fail to qualify him to opine as to navigational error. Instead, Blue Water complains that Schiehl: does not in his CV identify himself as an expert in navigation or list past experience testifying in court about navigation issues; did not operate a vessel

---

[3] New Hampshire argues that Kelley may offer these opinions as a layman under Rule 701. (*Id*.). Because Blue Water's motion is limited to Rule 702, the Court does not address New Hampshire's argument.

while in the Coast Guard; has not navigated a craft as large as the Vessel; has not navigated a vessel in Perdido Pass at night; and has navigated smaller vessels in the pass only in 20-foot and 47-foot vessels, and only about a dozen times. (Doc. 150 at 10-12). None of these objections is explained or persuasive.

With over a thousand marine casualty investigations under his belt, it is difficult to imagine what a separate line on his CV mentioning "navigation" would add to Schiehl's credentials. Nor is it significant that he may never have testified in court specifically as to navigational error; every expert has a first time. Although Schiehl did not operate a vessel while in the Coast Guard, he has operated a number of vessels in the 30 years since; nor is such experience essential to being an expert, else a physician would be unqualified to testify as to medical conditions unless she had experienced them personally. Likewise, Schiehl need not have operated a 61-foot yacht in Perdido Pass at night in order to be qualified to render opinions on proper navigation there. To the extent his limited experience with the pass is relevant, it goes to the weight to be afforded his testimony, not its admissibility.

Schiehl's report reflects his opinion that a prudent operator of the Vessel would not have attempted to enter Perdido Pass other than from the marked channel. He notes that Cooper was a Coast Guard-licensed captain; that Cooper had been to the area many times and was familiar with both the marked channel entrance and the underwater obstruction; that the obstruction is clearly marked on current paper and electronic navigational charts; that the Vessel was equipped with the latest charts, as well as electronic navigation devices, autopilots, GPS, and chart plotters; and that prior allisions with the obstruction involved unlicensed and/or inexperienced operators unfamiliar with the area, not persons with Cooper's license, experience, and familiarity with the pass. (Doc. 160, Exhibit C).

Blue Water claims that Schiehl did not employ a "reliable methodology" because he first determined that Cooper was intoxicated and then concluded that intoxication

caused the allision. (Doc. 150 at 14-15). The very pages cited by Blue Water demonstrate that this is incorrect. (Schiehl Deposition at 129-30). Schiehl's analysis is summarized in the preceding paragraph, and it does not base the finding of navigational error on a predicate finding of intoxication.

Blue Water next complains that, while admitting that the pass is "tricky" and potentially confusing, and that allisions with the wall are the most common sort of casualty in the area, Schiehl "did not consider" any of this in forming his opinion. (Doc. 150 at 16). Again, the record refutes the argument. Schiehl expressly discounted other allisions because they involved inexperienced operators who — because they lacked Cooper's familiarity with the pass — would attempt a crossing other than via the marked channel entrance and become confused by the opening in the east jetty, mistaking it for open water. (Schiehl Deposition at 159-61).

Finally, Blue Water argues that Schiehl performed an inadequate investigation in that he: did not interview Cooper or Rice or consider their depositions; did not experiment with nighttime navigation in the pass; did not determine whether the buoys in the pass can deceive vessel operators into believing the opening in the east jetty is the channel; did not confirm that the buoys and other navigational aids were working properly at the time; and did not determine what electronic charts the Vessel carried. (Doc. 150 at 16-17).

Blue Water does not explain the significance of these alleged omissions, and the Court will not supply the deficiency. The Court does, however, note the following. First, Cooper at his deposition took the Fifth Amendment to every substantive question posed, and there is no obvious reason to believe he would have submitted to an interview by Schiehl. Second, Blue Water relies on Rice principally to deny that Cooper drank before the allision, which is not the basis of Schiehl's opinion as to navigational error; at any rate, he had this information when he formed his opinions. Third, Schiehl did determine that the Vessel carried the latest electronic charts. (Doc. 160, Exhibit C at 4). Fourth,

Blue Water has failed to explain how the red and green buoy lights in the channel (between the east and west jetties) could have deceived Cooper into believing he was entering the pass correctly, since the channel (as Cooper would know from his extensive experience) runs basically north-south and the Vessel (as its compass would reflect) was traveling essentially due west.

In summary, Blue Water's motion in limine with respect to Schiehl's opinion that the allision was caused by navigational error is due to be denied.

### B. Intoxication.

New Hampshire proffers Schiehl to provide an expert opinion that Cooper was intoxicated at the time of the allision. (Doc. 158 at 8). New Hampshire admits that Schiehl is not a toxicological expert and that he conducted no study or testing to determine whether Cooper was intoxicated at the relevant time. (*Id*. at 7, 9). Instead, New Hampshire says that Schiehl's opinion is based on "the myriad evidence" of Cooper's intoxication at the time of the allision. (*Id*. at 9). According to Schiehl, however, the only thing he relied on was Cooper's arrest and the results of the breathalyzer test taken between one and two hours after the allision. (Schiehl Deposition at 158). Since Schiehl is not a toxicological expert, he has not been shown to be qualified to extrapolate the results of that test to Cooper's state at the time of the allision.

New Hampshire also proffers Schiehl to provide an expert opinion that Cooper's intoxication (assuming it is established from other sources) caused the navigational error resulting in the allision. (Doc. 160, Exhibit C at 4). Schiehl formed this opinion because, given Cooper's qualifications and experience with the pass, the only two explanations for the allision are impairment and deliberate destruction of the Vessel, and he has no reason to think Cooper acted deliberately. (Schiehl Deposition at 141). Blue Water suggests vaguely that no reliable scientific methodology underlies Schiehl's opinion. (Doc. 150 at

15).[4]  Schiehl's opinion, however, is not scientific testimony, and "[f]or nonscientific testimony the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *American General Life Insurance Co. v. Schoenthal Family, LLC*, 555 F.3d 1331, 1338 (11th Cir. 2009) (internal quotes omitted).  In particular, "[a] district court may decide that nonscientific expert testimony is reliable based upon personal knowledge or experience." *Id*. (internal quotes omitted).  Given Schiehl's 1,500 marine casualty investigations, the Court concludes that his testimony as to the possible causes of a navigational error is reliable for purposes of Rule 702 and *Daubert*.

In summary, Blue Water's motion in limine with respect to Schiehl's opinion that Cooper was intoxicated at the time of the allision is due to be granted, but its motion in limine with respect to his opinion that intoxication (if proved by other means) caused the navigational error that resulted in the allision is due to be denied.

### C.  Speed.

In Schiehl's opinion, the Vessel was traveling approximately 30 knots (or roughly 34.5 miles per hour) when the allision occurred.  This opinion is based on scratch marks found on the propeller shaft, made by its contact with the submerged wall, that reflect the Vessel traveled forward several feet[5] in one revolution of the shaft after striking the wall.

This information does not establish the speed of the Vessel, because it does not show how long it took the shaft to make one revolution.  Schiehl assumed that the shaft was making 20 revolutions per second, because that figure corresponds with the "normal

---

[4]Blue Water does not argue that Schiehl is unqualified to render this opinion; its objection to qualifications is limited to the opinion that Cooper was intoxicated.  (Doc. 150 at 12-13).

[5]Schiehl gave estimates of two feet, four feet, and several figures in between. (Schiehl Deposition at 195, 197, 200, 204 ).

operating range of [the] engines," that is, its power measured in revolutions per minute ("RPM"), which he understood to be 2,400. (Schiehl Deposition at 194, 205). Schiehl admitted he has no objective evidence that the RPM at the point of allision was 2,400. (*Id.* at 206). The best he can do is note that the Vessel made the 90-mile trip from Panama City in three hours, (*id.*), but that does not support a conclusion it was traveling at a similar speed as it entered the pass any more than a vehicle's interstate cruising speed of 70 miles per hour would support a conclusion that the vehicle was traveling at that speed while navigating the exit.

Blue Water argues that Schiehl's calculation of the Vessel's speed at the point of allision is not the product of a reliable methodology. (Doc. 150 at 20). The Court agrees that his opinion is based on circular reasoning and a critical assumption for which he admits he has no legitimate basis. Blue Water's motion in limine is due to be granted.[6]

### III. James Turner.

Turner reviewed New Hampshire's letter of August 3, 2007 and concluded that, "to a reasonable degree of certainty in the insurance industry, [it] constitutes a Denial letter rather than a Reservation of Rights letter." (Doc. 153, Exhibit A at 3). Central to this conclusion is that the letter does not state that "no final decision as to coverage has been made." (*Id.* at 2). Such language, Turner states, is an "essential element" of, and "absolutely necessary" to, a reservation of rights letter. (*Id.* at 2-3). While the letter twice refers to a reservation of rights, Turner characterizes this language as "lip service." (*Id.* at 3).

---

[6]Schiehl's report states that "[t]he damage to the running gear suggested the vessel was running at a high speed at the time of the grounding." (Doc. 160, Exhibit C at 3). In his deposition, he testified that the degree of damage to the bottom of the boat indicated the Vessel was "moving at a clip," enough to get it past the wall without hanging up on it, although he did not express a numerical estimate of speed based on this evidence. (Schiehl Deposition at 207-08). Blue Water's motion does not attack this portion of Schiehl's opinion as to speed.

-11-

New Hampshire argues that Turner is unqualified to render an opinion as to an industry standard concerning language necessary to a reservation of rights letter and that his opinion in this regard is not reliable.  New Hampshire also argues that Turner's characterization of portions of the letter as "lip service" impermissibly opines on the author's subjective intent.  Finally, New Hampshire argues that Turner's opinion that the letter is a denial letter is not helpful to the trier of fact.

New Hampshire points to the following in questioning Turner's qualifications: he has received no training on insurance matters since 1988; he has been retired from CNA since 1997; he has written only one or two reservation of rights letters since that time; he has done nothing to determine if industry standards have changed since 1997; he has authored no paper on proper reservation of rights language; he has never testified in court as an expert; he has never served as an expert on reservation of rights matters; he consulted no written sources to develop his opinion; and he knows of no written source discussing the requirements of a reservation of rights letter.  (Doc. 152 at 10-12).

Other evidence reflects that Turner:  was employed by CNA and its predecessor for 30 years, during which time he authored over 1,000 reservation of rights letters; received training during his employment concerning such letters; and learned about industry standards for such letters through networking and discussions with other members of the industry.  (Turner Deposition at 39, 53, 127-28).  An expert may be qualified by knowledge, experience or training, Fed. R. Evid. 702, and Turner's testimony reflects that he has extensive personal experience drafting reservation of rights letters, that he has been trained concerning them, and that he has knowledge (based on conversations with others in the business) about industry standards for them.  That is enough to qualify Turner as an expert; the matters on which New Hampshire relies go at most to the persuasiveness of his opinions, not to his threshold qualifications to render them.

New Hampshire asserts that networking and discussion with other members of the

-12-

industry do not provide a reliable basis for an expert opinion as to the existence and content of an industry standard because they constitute mere "street gossip." (Doc. 152 at 13-14). The single case on which New Hampshire relies involved an opinion characterizing a particular insurer as "aggressive" in its claims practices and not, as here, an opinion that certain conduct violates an industry standard, which standard could reasonably be learned from such conversations.

New Hampshire's only objection to Turner's use of the term "lip service" to describe the letter's reference to reservation of rights is that the phrase constitutes an impermissible opinion as to the subjective intent of the letter's author. (Doc. 152 at 2, 14-16). Turner denied that he was attempting to opine on the author's subjective intent and stated he was using the term in its ordinary sense. (Turner Deposition at 117). The phrase has been defined to mean "an avowal of advocacy, adherence, or allegiance expressed in words but not backed by deeds." Merriam Webster's Collegiate Dictionary 679 (10th ed. 1994). The Court construes the term as used by Turner to mean only that the use of reservation of rights language is ineffective because the letter elsewhere uses language suggesting a denial[7] and fails to use language indispensable to a reservation of rights. This is not a comment on the author's subjective intent, but on the effect of the language used.

New Hampshire argues that Turner's opinion that the August 3 letter is a denial letter is not helpful to the jury because Turner testified that any layperson reading the letter would understand it as such. (Doc. 152 at 16-18). But the basis of Turner's opinion that it is a denial letter is his professed awareness of an industry standard that, absent language that no final coverage decision has been made, the letter cannot be a reservation of rights letter. A layperson cannot be expected to know of this standard without Turner's

---

[7]The letter includes the language, "it appears that coverage will not lie for the subject casualty." (Doc. 153, Exhibit C at 4). Turner relied on this language. (Turner Deposition at 74).

testimony, which makes it more likely that the letter is, as he opines, a denial letter.  Nor does Turner's opinion that any layperson would interpret the letter as a denial letter make it so; it appears to the Court that reasonable persons could read the letter as being other than a denial letter.

In summary, New Hampshire's motion in limine is due to be denied.

## CONCLUSION

For the reasons set forth above:

Blue Water's motion in limine concerning Jody Kelley is **granted**.  Kelley will not be permitted to offer expert testimony that Cooper was intoxicated at the time of the allision or that Cooper's intoxication caused the allision.

Blue Water's motion in limine concerning Michael Schiehl is **granted** with respect to his opinions that Cooper was intoxicated at the time of the allision and that the Vessel was traveling approximately 30 knots at the time of the allision, and it is **denied** in all other respects.  Schiehl will not be permitted to offer expert testimony that Cooper was intoxicated at the time of the allision or that the Vessel was traveling approximately 30 knots at the time of the allision.  Schiehl will be permitted to offer expert testimony that the allision occurred as a result of navigational error and that (assuming Cooper's intoxication at the time is established through other means) the most probable cause of the navigational error was Cooper's intoxication.

New Hampshire's motion in limine concerning James Turner is **denied**.  Turner will be permitted to offer expert testimony that the August 3, 2007 letter was a denial letter, that a statement that no final decision on coverage has been made is an essential element of a reservation of rights letter, and that portions of the letter referencing a reservation of rights are outweighed by other language suggesting a denial and by the failure to expressly state that no final decision as to coverage has been made.

DONE and ORDERED this 27th day of April, 2009.

                                      s/ WILLIAM H. STEELE
                                      UNITED STATES DISTRICT JUDGE